Okay, thank you. Alright, the next case is Russell v. Comstock, Appeal No. 24-1100. Miss Steinberg. You can begin whenever you're ready. May it please the Court, Becca Steinberg for Appellant Johnny Russell. A jury could find that no reasonable officer would think that Mr. Russell was in his apartment, and the District Court erred in concluding otherwise. Here's how a jury might reach that conclusion. First, a jury could rely on clear pieces of evidence that Russell has left. Consider three- Is that the test, though? Is that the proper test for a jury, the jury question? I guess, what if Russell's in the apartment dead? You know, in other words, the police officer show up and the victim says, Russell stabbed me and fled. And the truth is that Russell stabbed the victim, who then killed Russell in the apartment, and then stood on the front lawn and said, Russell has fled. Do the police officers have no authority whatsoever to go into the apartment for 25 seconds to make sure Russell's not laying on the floor dead? No, they don't. And two points on that. First, there's the General Fourth Amendment. Would it be the exact same answer in a domestic situation? In the domestic situation, that could possibly involve an exigency exception, which the officers did not invoke below, and which this Court, in cases like Arch, has analyzed separately from the protective sweep exception. Yeah, that's my next question. Why is it, in Arch, it was a very similar situation where protective sweep was argued as the exception to the Fourth Amendment, and we said, no, it's not a protective sweep, but we went on to analyze it under exigent circumstances and found that there were exigent circumstances. Why can't we do the same here? Because there's several things distinguishing this case from a case like Arch. So in Arch, the officers, when Mr. Arch opened the motel room door, they could see a bloody rag. Mr. Arch was behaving very violently. It took three to four officers to subdue to him, and they were able to see, before they even went in, that everything in the room was upturned. And here, those pieces of evidence were directly linked back to the motel room that Mr. Arch was in. But what's been clear in this Court's cases like Bowie for the protective sweep context, as well as in cases like Arch, is there has to be some nexus between the place to be swept and whether it's exigency or whether it's a protective sweep, the reason that the officers went in. But on top of that, there's nothing, on top of the fact that there's nothing linking any circumstances to Mr. Russell's apartment here, the fact is it's not an exigency, because the officers waited an hour and a half between when the situation occurred and when they got into the apartment. And we would expect, in the exigency circumstance, for there to be some sort of immediate need, rather than what happened here, the officers staying on the first floor for an hour and a half and not waiting for... Ms. Steinberg, even if there is a question as to whether a sweep conducted an hour after the officers arrived on scene is constitutional, wouldn't the officers have qualified immunity here? I mean, is there any clearly established case law that imposes a temporal limitation on a protective sweep? So, Judge Rogner, the purpose of qualified immunity is to make sure that the officers have notice about what they can and cannot do. The test from Bowie says there have to be articulable facts that would connect the place to be swept with an individual posing a danger. Everyone agrees, including the officers, that if no reasonable officer could think that Mr. Russell was in his apartment, then there's no... And no reasonable officer could go in, because a warrant would be required. We think... What about the third person that might be in wait, that no one seems to know, you know, where he or she went or did or anything else? So two points on that, Judge Rogner. First, we think it's pretty clear from the record, or at least a jury could find that it's clear for a record, that it was clear that third person had left, based on Howe and Marvitz's statements. But second, this third person, Mr. Cannon's guest. There's nothing linking Mr. Cannon's guest to Mr. Russell's apartment. So it's not enough to say, we don't know where this person is. They would have to actually have articulable facts linking this person to Mr. Russell's apartment. That's like Delgado, where they didn't know where the suspect was, but because there was nothing linking the suspect to the apartment that the officer went into, you know, there the government didn't even try to argue that it was a protective sweep. But here I think, you know, going back to Mr. Russell, which has been the crux of the officer's arguments, both here and below, we think a jury could find that no reasonable officer would think he was in his apartment. And I would point to three specific facts on that point. First, the CAD report and Officer Koka's 116 update that he had left in a vehicle going northbound. Second... So your position is the officer has to accept that fact as true? We think that a jury could find that officers regularly rely on the CAD report based on the Garcia... The problem is officers are facing uncertainty. And part of your brief seems to suggest, well, if they're searching for his car, then they're not allowed to search for him in the apartment. They're allowed to pursue multiple theories, right? Certainly they're allowed to pursue multiple theories. So they don't have to take anything necessarily at face value. That doesn't mean you lose, but what were the other facts? The report that he left in the vehicle? Yeah, so Officer Koka's statement, you have Investigator Spiegelhoff's sworn declaration in support of the warrant affidavit that apartment manager Marvitz told her he had left and that his car was gone. And that's, you know, is it different from what she's saying now in the pendency of litigation? And the third thing that I would point to is our apartment manager Howe's statements on the video repeating that he had left and that his car wasn't there. So let's assume though that maybe it's not conclusive. Maybe there's, you know, maybe he might be in there. They're still not entitled to go in without a warrant, are they? Unless there's some immediate danger. Correct. And Bowie says that- Have you found in our case law, at least all the protective suite cases that I've seen, have involved somebody armed with a gun who poses a threat to people outside? Absolutely. Is there anything, have you found any knife cases? No, we haven't. But Bowie makes it clear that this person has to pose a danger to the officers. And Bowie also makes clear that a hunch isn't enough for the officers to go in. Going back to your earlier point about pursuing multiple avenues. An officer might subjectively think based on their gut that he was in there, but Bowie says that gut reaction isn't enough. What you need is articulable facts. They don't have them here. So the 110 call by an unknown caller was flatly contradicted six minutes later and didn't even identify the correct floor in the first place. And they also point to Marvitz's statements disclaiming any knowledge about Mr. Russell's whereabouts. And that just can't support an inference that he was in the apartment. Can I ask you, Ms. Steinberg, before, what do you think the damages would be if Mr. Russell were able to prevail here? Yes, I see I'm going into my rebuttal time. Is it okay if I answer the question? Sure. Okay. So first we think there might be emotional distress damages, but second is the Supreme Court has recognized that nominal damages are available for the violation of the constitutional rights, even in the absence of actual damages. I'm trying to imagine emotional distress from this that would be distinct from having gotten into a knife fight and wounding somebody so that he's in prison. Right. That wasn't briefed here below because the summary judgment motion was at the liability stage. But regardless of that, nominal damages might still be available, even in the absence of actual damages, because his Fourth Amendment rights were violated. Okay. Thank you. Mr. Truesdale. You may have pleased the court. Your Honors, my name is Ryan Truesdale and I represent the defendant's appellate. First, Russell has conceded in his appellate brief that he's not appealing the summary judgment decisions regarding Wogelmuth or Comstock. So with that in mind, I'm only going to be focusing on the appeal as it relates to Officer Powell. This case arises from a protective sweep that the district court deemed as reasonable. I respectfully request that this court affirms that decision and denies Russell's appeal. So let's look at the facts of what happened on this particular day. On June 25th, 2020, Racine Police Department officers were dispatched to plaintiffs' apartment in response to an assault complaint. Can I ask you a question? Sure. When they did the sweep of the apartment, who were they protecting? Who were they protecting? Multiple people. So, number one, themselves, because we don't know where this... From what threat? Russell had just stabbed a man. He had stabbed a man. We don't know where he is. But we're also looking at a multi-unit apartment complex. The case on Bowie does state that it's going to be dangerous to officers as well as others. So there is a potential, maybe even this third party. We don't know who the third party is. At best, for your case, there's an outside possibility Russell is in a locked apartment, right? What danger does he pose while an officer, an armed officer, waits in the hallway while the detective goes and gets a warrant? He himself could be injured. The third party could have been in there injured. Any indications of that? Again, right now we're looking at what was known at the time by the officers and all they knew was that people were missing and that there's a weapon missing. In the more than one hour between the arrival of the officers on the scene and the sweep of Russell's home, what efforts were made to obtain an arrest or search warrant? Do we know? Well, and if I could take a few steps back with this, when the people originally went to the apartment complex to see Cannon outside, he was bleeding, he's injured. They were taking care of him. They were helping him out. Everybody left the scene. There was over 30 minutes at this point of an unsecured scene and that can be seen in the CAD notes. So was there, you know, I do not know what efforts were taken for an arrest warrant during this time because they're still figuring things out, including talking to Cannon at the hospital. That goes a little bit beyond where the record is in this right now, but that's where it was. How many apartments were there in this building? I couldn't tell you with any certainty. As you saw in the body camera footage, there were a lot in there. I would be speculating at least 10 per floor. We have two, and I was going to say it is two floors in this apartment complex with a lobby. And in examining whether the officers had a reasonable belief that Russell was in the into that analysis, does it make it less likely? Your Honor, I think it makes it more likely. We're looking at, so an hour or so passes. We know that there is 30 minutes where nobody is at the scene. This is just an unsecured location. You know, we have one person saying he might have taken off. He might have driven this way. He also could have went back and he could have went back for multiple reasons. We just don't know. And that's what the officers were grappling with that day. So what do you make of the language in our Delgado opinion? Now that actually involves somebody with a gun. The mere fact that the shooter was generally at large is not enough for a reasonable officer to specifically believe he was in the apartment. I think it is, this case I feel is different than the Delgado decision, Your Honor. There's multiple things here where Marvitz is kind of the crux of this case. Marvitz shows up saying, we don't know where he is. There's a third party that's around. He even states in his body camera footage that the doors were left open when you all left. This is to the officers. So he's indicating, much like the Cad Note state, there wasn't anybody on the scene. So we have this unsecured location. We have a weapon missing. Now when we look at the Delgado decision, there it was really way more of hunches. Somebody had told the officers that the injured person went back to Delgado's apartment. And so they go to Delgado's apartment and they still are looking for this suspected shooter that doesn't match any of their descriptions. And so at that point, they just went in. And the court said, this is unreasonable to think that there is essentially a standoff of three people that aren't doing it, that aren't indicating anything to the officers. Here again, we have so many things that came to us, especially from Marvitz. And that is really what lights the fire on this. So this court, when we look at the standard for protective sweep, it's reasonable suspicion. This is lower than probable cause. We require more than a hunch for these articulable facts and inferences that there might be a danger present. Officers do not have crystal balls. They work in possibilities, not certainties. This is why the Seventh Circuit has held that police are responding to a possible crime. Police judgments should be afforded an extra degree of deference. This does not require absolute certainty. And we need to look at this, again, in the lens of what was reasonably known to the officers at the time. And it bears repeating that what was known at the time is, again, it's an unsecured location. There was a stabbing. The person is at large. And there's a third party, and we have no idea how he relates to this. These were the articulable facts. The reasonable inference to be made was that somebody on the scene could be injured. As Bowie states, it's not just the officers. It includes others. So it sounds like you've moved from an immediate danger to people outside the apartment to an exigent circumstances theory that maybe somebody is bleeding and injured inside the apartment. That seems an entirely new theory, and it's very hard to reconcile with the hour wait and the behavior of the officers as they went up the stairs and into the apartment. Again, with the hour wait, we are looking at an unsecured location. So I understand... Sorry, I got distracted. I go back to Judge Rovner's question about passage of time here. None of this looks very exigent. Well, with this, it was a protective sweep. They reasonably believed somebody could have been in danger. So if a person is harmed inside or something...  That's the right phrasing, okay, but as applied to these facts, who, when, how, I thought the idea was that if Russell was in the apartment, he posed an immediate danger.  Right, okay, and I guess that takes us back to Judge Kirsch's original question. So, okay. Does the 37 minutes... I'm sorry. Does the amount of time involved here... help you? And again, I think it does because we're looking at an unsecured location. This gives Russell plenty of time to potentially show up to do something. These officers, again, they are just going into a situation that's very serious, not knowing what's happening. You know, again, to look at the CAD notes to make sure we're clear here, it does show, for example, that these officers were all at the hospital. When you see things such as Wheaton, that means they're at Wheaton Franciscan Healthcare. If you see SMMC, it's St. Mary's Medical Center. Just because there's an address when the address is in parentheses, that doesn't mean they're at the scene. So we certainly have an unsecured location. So what plaintiff is essentially looking at here is they're saying to look at 20-20 hindsight. Is it your position that the time that they're at the apartment is less important because it's more that they're conducting the protective sweep before they leave, before they wrap up? Could you ask that again? Yeah, is the time that they're at, it took an hour, an hour and a half before they did the protective sweep. I assume they did the protective sweep right before they left. So they did the protective sweep, they went in there, and then they got the search warrant, and the people did stay on the scene at that point, if that answers the question. Oh yeah, yeah, for the search warrant. But let me ask it a different way. Does the fact that they were in the apartment for 25 seconds or 20 seconds, does that inform our analysis in any way? Thank you, I appreciate that, Your Honor. And absolutely. The court has stated the less intrusive a search, the less justification is required. So here, it's uncontested. It was 37 seconds. They went in, they were out, they didn't look. They weren't looking for any evidence. They were only looking for where a person could hide. All right, thank you. All right, Ms. Steinberg. This court has made clear that it is important to carefully guard the narrowness of the protective sweep exception, because otherwise it could be used to eviscerate the warrant requirement. What we have gotten from the officers, both here and in their briefing, has been speculation that Mr. Russell might be in- Could you respond to the 37-second issue? Yes, that goes to the issue of scope, not whether a protective sweep was justified in the first place. So in cases- But is it less required to do a- less articulable facts required if they're doing a protective- They were clearly looking for a body here. They weren't looking in cabinets or in toilets or anything like that. They were looking for a body. So both the Supreme Court in this case and in cases like Bowie and Burroughs has separated the protective sweep inquiry into two questions. One, is it okay to go in in the first place? And then the second, if it is, was the scope reasonable? We're not bringing a scope challenge. The second point is that even though they were in the apartment for a short period of time, they crossed that threshold into the home. This court and the Supreme Court have repeatedly emphasized that the home is the core of the Fourth Amendment right, and Mr. Russell's rights were violated when the officers went in without a warrant. If there are no further questions, I ask this court to reverse endeavor. Thank you, Ms. Talbert. Thank you to both counsel and the case will be taken under advisement.